In re Harvey Wettack ORNDORFF,
Debtor.

NORWEST BANK OF IOWA, N.A., d/b/a
Norwest Card Services, Plaintiff,

v.

Harvey W. ORNDORFF, Defendant.

Bankruptcy No. 92–01117–C.
Adv. No. 93–0206–C.

United States Bankruptcy Court,
N.D. Oklahoma.

Jan. 18, 1994.

Theodore P. Gibson, Tulsa, OK, for plaintiff.

Brian W. Huckabee, Tulsa, OK, for debtor/defendant.

## MEMORANDUM OPINION

STEPHEN J. COVEY, Bankruptcy Judge.

This matter comes on to be heard upon the complaint of Norwest Bank of Iowa, N.A. d/b/a Norwest Card Services ("Norwest") asking that its debt in the principal amount of $5,177.57 against Harvey W. Orndorff ("Debtor") be declared nondischargeable pursuant to Section 523(a)(2)(A). This Court having heard the testimony of the witnesses, having examined the documentary evidence and being fully advised in the premises finds as follows.

## STATEMENT OF FACT

In 1970, Debtor made application and was granted a MasterCard credit card by the Bank of Oklahoma with a limit of $500.00. Thereafter, the MasterCard Division of the Bank of Oklahoma was purchased by Norwest. On January 2, 1990, Norwest, at the request of Debtor who had lost the original card, issued a replacement card with a limit of $5,000.00. During 1992 and early 1993, the charges and payments made by Debtor on this card are as follows:

| Date | Purchases | Cash Advances & Access | Payments & Credits | Finance Charge | Balance |
|---|---|---|---|---|---|
| | | | | | $2,935.17 |
| 4/24/92 | | $3,040.00 | $2,935.17 | $ 18.87 | $3,058.87 |
| 5/27/92 | | | $ 91.00 | $ 52.70 | $3,020.57 |
| 6/25/92 | | | $2,986.49 | $ 14.76 | $ 48.84 |
| 7/27/92 | $ 93.98 | | $ 48.84 | | $ 93.98 |
| 8/26/92 | $113.93 | | $ 93.98 | | $ 113.93 |
| 9/25/92 | $ 99.15 | | $ 113.93 | | $ 99.15 |
| 10/26/92 | $ 65.73 | $1,548.38 | $ 99.15 | $ 39.20 | $1,622.35 |
| 11/24/92 | $ 57.52 | $2,876.12 | | $121.63 | $4,620.10 |
| 12/24/92 | | | $ 171.33 | $ 44.54 | $4,493.31 |
| 1/26/93 | $ 23.60 | $1,180.00 | $ 12.37 | $ 75.95 | $5,736.89 |
| 2/24/93 | $ 20.00 | | $5,736.89 | | $ 20.00 |
| | Total Paid | | $12,289.15 | | |

A series of access checks had been sent to Debtor at the time he received the replacement card and, on March 25, 1993, Debtor used one of these checks to pay off United Bankcard on its credit card balance. The amount of the check was charged against the Norwest credit card. It is this amount, plus interest, that Norwest wants excepted from Debtor's discharge.

At the time of these transactions, Debtor was 88 years old and was gradually going blind following a cataract operation two years earlier. In February 1993, approximately one month prior to writing the March 25th access check to United Bankcard, Debtor had turned his financial affairs and the bookkeeping relative thereto over to his son, Jim.

Debtor instructed his son to write the check paying off United Bankcard with the access check from Norwest because the Norwest card carried a slightly lower interest rate.

For over twenty years Debtor had raised hay and cattle. At the time he used the access check, Debtor intended to continue his business and use the money earned to repay the amount due Norwest. Debtor testified he had no serious doubts about his ability to pay Norwest because he was confident the proceeds from the sale of the hay and cattle in the fall would provide enough to make a substantial payment.

In addition to his income from the hay and cattle business, Debtor received a social se-

curity check in the amount of $703.00 per month. His monthly living expenses were $926.00.

Within days of writing the access check and after consultation with his son, Debtor came to the conclusion that his increasing blindness prevented him from further operating the hay and cattle business. Because his monthly expenses exceeded his income and because he owed over $14,000.00 in credit card debt, and over $14,000.00 of secured debt to Farmers' Home Administration ("FmHA"), Debtor decided to seek legal advice.[1]

Debtor went to see a lawyer in Nowata, Oklahoma, and was referred to a Tulsa attorney. The possibility of filing bankruptcy was discussed with both lawyers.

On April 7, 1993, Debtor filed for relief under Chapter 7 of the Bankruptcy Code. The bankruptcy schedules listed twelve credit card companies and FmHA as the only creditors. His assets consisted of $100.00 cash, a 1978 truck and the FmHA collateral. The truck had been purchased just prior to bankruptcy because Debtor knew that FmHA planned to repossess his other vehicles. The truck cost $1,600.00 and was paid for by using funds from his farm account which had a balance of $2,957.12 at the time of the purchase. No evidence was introduced as to the disposition of the remaining funds. The truck was to be used by a part-time employee in the hay and cattle business.

## CONCLUSIONS OF LAW

■ Norwest contends that its debt should be excepted from discharge pursuant to § 523(a)(2)(A)[2], which provides as follows:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtors or insiders financial condition* [.]

11 U.S.C. § 523(a)(2)(A) (emphasis added).

■■ Under this section, a debt may be excepted from discharge upon proof of the following elements:

1. The debtor made a false representation *in regard to something other than his financial condition;*

2. The debtor made the representation with the intent to deceive the creditor;

3. The creditor relied on the representation;

4. The creditor sustained a loss as a result of the representation.

*In re Mullet,* 817 F.2d 677 (10th Cir.1987). These elements must be proven by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Objections to discharge are narrowly construed to give a debtor the full benefit of the fresh start provided for by the Bankruptcy Code. *In re Black,* 787 F.2d 503 (10th Cir.1986).

■ The crux of Norwest's complaint is that Debtor made an "implied representation" at the time he used the access check that he had the ability to pay. Norwest contends that this representation was false because Debtor owed twelve credit card companies and the FmHA in excess of $28,000.00 and did not have sufficient income to meet his living expenses.

Norwest relies on cases which adopt the implied representation theory. It is currently the majority rule. *See In re Vermillion,* 136 B.R. 225 (Bankr.W.D.Miss.1992); *In re Borror,* 132 B.R. 194 (Bankr.M.D.Fla.1991); and *In re Touchard,* 121 B.R. 397 (Bankr. D.Utah 1990); Hon. Nancy C. Dreher and Matthew E. Roy, *Bankruptcy Fraud and Nondischargeability Under Section 523(a) of*

---

1. FmHA was secured by all Debtor's farm equipment, trucks, cattle and hay. This collateral was liquidated subsequent to bankruptcy by FmHA and applied to its debt.

2. Norwest also argued that its debt was nondischargeable under § 523(a)(2)(C). However, the Court held that use of an access check to pay the balance due on another credit card is not a cash advance and therefore § 523(a)(2)(C) does not apply.

*the Bankruptcy Code*, 69 N.D.L.Rev. 57 (1993).

Other courts reject this theory and employ what is known as the assumption of risk doctrine. *See First National Bank of Mobile v. Roddenberry*, 701 F.2d 927 (11th Cir. 1983) and *In re Carpenter*, 53 B.R. 724 (Bankr.N.D.Ga.1985). These courts hold that unless a credit card company has revoked the card, it assumes the risk that debtors who do not have the ability to pay will use the card. Only those charges made after the card has been revoked will be declared nondischargeable.

Other cases look at the totality of the circumstances and apply up to twelve factors in determining whether the debtor was guilty of actual fraud when the card was used. A leading case which discusses the totality of circumstances approach is *In re Dougherty*, 84 B.R. 653 (Bankr.9th Cir.1988). This case lists the twelve factors as follows:

1. The length of time between the charges made and the filing of bankruptcy;

2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;

3. The number of charges made;

4. The amount of the charges;

5. The financial condition of the debtor at the time the charges were made;

6. Whether the charges were above the credit limit of the account;

7. Whether the debtor made multiple charges on the same day;

8. Whether or not the debtor was employed;

9. The debtor's prospects for employment;

10. Financial sophistication of the debtor;

11. Whether there was a sudden change in the debtor's buying habits; and

12. Whether the purchases were made for luxuries or necessities.

84 B.R. at 657 (citations omitted).[3]

This Court believes that of the above three theories, the totality of the circumstances approach is the most equitable and logical way to proceed. However, regardless of which approach is applied in this case, the Court finds that there is a fatal flaw in Norwest's position which defeats its claim of nondischargeability. The defect arises from the fact that Norwest bases its claim on the existence of an implied representation in regard to Debtor's ability to pay.[4] This is a representation as to Debtor's financial condition which cannot be used to except a debt from discharge under § 523(a)(2)(A). *See In re Nantz*, 44 B.R. 543 (Bankr.N.D.Ill.1984) (statements of financial condition are explicitly excepted from the operation of § 523(a)(2)(A).)); *In re Senty*, 42 B.R. 456 (Bankr.S.D.N.Y.1984) (oral or implied representations of financial condition, alone, are not actionable under § 523(a)(2)). *See also Engler v. Van Steinburg*, 744 F.2d 1060 (4th Cir.1984); *Blackwell v. Dabney*, 702 F.2d 490 (4th Cir.1983); *In re Mailath*, 108 B.R. 290 (Bankr.N.D.Okla.1989); *In re Richey*, 103 B.R. 25 (Bankr.D.Conn.1989); *In re Blackburn*, 68 B.R. 870 (Bankr.N.D.Ind.1987); *In re Roberts*, 54 B.R. 765 (Bankr.D.N.D.1985); *In re Schwartz*, 45 B.R. 354 (S.D.N.Y.1985) and *In re Patch*, 22 B.R. 970 (Bankr.D.Md. 1982).

As the court stated in *In re Blackburn, supra*:

To the extent [the] allegation of fraud under § 523(a)(2)(A) hinges on an implicit representation by the debtor that she had the ability to pay for the charged purchase when in fact she did not, it is plainly precluded by the statutory language. Section 523(a)(2)(A) explicitly excludes "a statement respecting the debtor's ... financial condition" as grounds for finding false pretenses, a false representation, or actual fraud. Indeed, for the debt to be excepted from discharge, subsection (B) of § 523(a)(2) specifically requires that a debtor's materially false statements about the debtor's financial condition involve the

---

3. For a complete discussion of the three approaches *see* Steven H. Resnicoff, *Dischargeability in Bankruptcy of Debts Incurred by "Purported Purchaser,"* 64 St. John's L.Rev. 253 (1990). *See also* 2 DAVID G. EPSTEIN, et al., BANKRUPTCY § 7–26(a) (1992).

4. Norwest did not offer any evidence that Debtor misused the card or that he was guilty of actual fraud based upon application of the above twelve factors.

"use of a statement in writing ..." If the misrepresentation on which an allegation of fraud turns concerns the debtor's financial condition, the misrepresentation must have been in writing.

68 B.R. at 877.

Basically, Norwest wants the Court to infer an intent not to pay and an intent to deceive from Debtor's implied representation or statement as to his financial condition. This the Court cannot do. Inferences based upon an implied statement of financial condition cannot be used to except a debt from discharge under § 523(a)(2)(A) any more than the implied statement of financial condition can be used itself.

 If a creditor in extending credit wishes to rely on representations as to a debtor's financial condition, it must obtain these representations in writing. If the representations are false and the creditor relies on them, then the creditor may have its claim excepted from the discharge under § 523(a)(2)(B).[5]

■ Another reason the claim of Norwest must be denied is that, applying the twelve factors listed above, Norwest has not proven that Debtor was guilty of actual fraud or that he used the access check with an intent to deceive Norwest. The evidence reveals that Debtor merely used the access check to pay off another credit card balance in order to save a few points on the interest rate. Debtor received nothing of value out of this transaction. He merely substituted one credit card debt for another. In fact, if Debtor had known he was going to file bankruptcy, it would have been to his advantage to leave the debt with the other credit card company rather than create a new debt to Norwest just prior to bankruptcy. Finally, at the time Debtor used the access check, he intended to continue in the hay and cattle business and he honestly believed he would realize enough proceeds to repay Norwest. In fact, Debtor had paid over $12,000.00 to Norwest the previous year. Debtor clearly did not intend to deceive Norwest.

5. Section 523(a)(2)(B) requires:
   (B) use of a statement in writing—
   (i) that is materially false—
   (ii) respecting the debtor's or an insider's financial condition;

Additionally, this Court holds that Norwest did not rely upon any implied representation of an ability to pay. Banks issue credit cards in great volume because they know it is a profitable business based upon high rates of repayment and high rates of interest. Banks do not rely on implied promises of ability to repay each time a card is properly used.

This Court does not mean to imply that a credit cardholder can use a credit card in a fraudulent fashion. If a cardholder uses the card after it has been revoked, in excess of its limits, or on a pre-bankruptcy spending spree, the Court would not hesitate to find actual fraud absent some compelling explanation by the debtor. This finding of fraud, however, would be based upon improper conduct on the part of the debtor in the use of the card and not upon an implied representation of ability to pay.

A separate Judgment Order will be entered consistent with the Memorandum Opinion.

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive[.]